UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Colleen Collins, et al.

        v.                          Civil No. 13-cv-352-JD
                                    Opinion No. 2015 DNH 015
Dartmouth-Hitchcock
Medical Center and
James E. Saunders, M.D.


O R D E R

        Colleen Collins and her sisters, Ruth Collins and Debra
Ceriello, brought suit against Dartmouth-Hitchcock Medical Center
("DHMC") and Dr. James E. Saunders, alleging claims under the
Americans with Disabilities Act ("ADA") and the Rehabilitation
Act, along with state law claims.  Their claims arose from
Colleen's post-operative and subsequent treatment at DHMC related
to her deafness.[1]  DHMC and Dr. Saunders move for summary
judgment on all of the plaintiffs' claims.  The plaintiffs
object.


Standard of Review

        Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  In deciding a motion for summary judgment, the court
draws all reasonable inferences in favor of the nonmoving party.

---

        [1]Because Colleen and her sister, Ruth, share the last name
Collins, to avoid confusion all of the plaintiffs will be
referred to by their first names:  Colleen, Ruth, and Debra.

Foodmark, Inc. v. Alasko Foods, Inc., 768 F.3d 42, 47 (1st Cir. 2014).  "A genuine issue of material fact must be built on a solid foundation--a foundation constructed from materials of evidentiary quality" so that "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative will not suffice to ward off a properly supported motion for summary judgment." Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014).

In response to a properly supported motion for summary judgment, opposing parties must provide competent record evidence that shows there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mosher v. Nelson, 589 F.3d 488, 492 (1st Cir. 2009).  The plaintiffs, who are represented by counsel, did not provide "a short and concise statement of material facts, supported by appropriate record citations, as to which [the plaintiffs] contend[] a genuine dispute exists so as to require trial."  LR 56.1(b).  Instead, the plaintiffs titled the section that is nearly their entire memorandum as "Disputed Material Facts."  That section is not limited to factual statements with record citations but instead includes citations to statutes and cases and argument interspersed with the factual statements.  The plaintiffs' failure to follow the applicable local rule both unnecessarily complicated the process of assessing their objection to summary judgment and, to some extent, undermined the effectiveness of their arguments.

Background

Colleen Collins has had hearing loss since childhood and has been a patient at DHMC since 1967. Over time, Colleen became profoundly deaf and received a cochlear implant.[2] During her treatment at DHMC, Colleen communicated with her providers by lip reading, with the assistance of the cochlear implant.[3]

Dr. James E. Saunders is an otolaryngologist who began treating Colleen in 2009. At an appointment in August of 2011, Dr. Saunders and Colleen discussed her cochlear implant that was beginning to fail. As in previous meetings, Colleen and Dr. Saunders communicated by voice and lip reading. They discussed a plan to replace the failing implant with a new one that would become operational within approximately thirty to forty-five days after the surgery. Surgery was scheduled for September 16, 2011.

Colleen had never requested an American Sign Language ("ASL") interpreter for her appointments at DHMC. Dr. Saunders did not know that Colleen understood ASL. Beginning in 2007, DHMC began a program, known as CMapp, that schedules ASL interpreters for appointments at DHMC whenever a patient requests an interpreter.

---

[2]"A cochlear implant is a surgically implanted device that provides sound to individuals who are profoundly deaf or severely hard of hearing." Aff. of Dr. James E Saunders, docket no. 19-4, ¶ 5.

[3]Colleen also communicated with her family, friends, and colleagues at work predominantly through a combination of lip reading and her cochlear implant, although she used sign language to communicate with friends who were deaf.

On September 16, 2011, Colleen arrived for surgery accompanied by her sisters, Ruth and Debra.  During the surgery, Dr. Saunders removed the failing cochlear implant but found a cholesteatoma, an abnormal growth in Colleen's middle ear.  He removed the cholesteatoma, but the area had to heal before he could insert a new cochlear implant.

After the surgery, Dr. Saunders and Stella McHugh met with Ruth and Debra to explain the results.  McHugh is a clinical audiologist and cochlear implant audiologist at DHMC.  Dr. Saunders explained the cholesteatoma and its consequences.  To assist their understanding, Dr. Saunders drew a diagram of the inner ear, showing the location of the cholesteatoma.  He told Ruth and Debra that he had removed the failing cochlear implant and the cholesteatoma but that additional surgery would be needed in four to six months, after the area had healed, to insert a new cochlear implant.  During the meeting, Debra and Ruth mentioned that Colleen knew ASL, which surprised Dr. Saunders and McHugh because Colleen had never mentioned using ASL and had never asked for an ASL interpreter.

During the post-surgery meeting, Dr. Saunders told Debra and Ruth that Colleen had a tumor, the cholesteatoma.  Debra understood the cholesteatoma was abnormal cell growth, scar tissue growth, and was an enzyme that had dissolved bone in Colleen's ear canal and was working its way into the skull.  Further, every cell had to be scraped out because if any were left behind they would grow, get into her brain, and kill her.

4

Debra said that the diagram Dr. Saunders drew was very helpful in understanding what he was explaining.  Debra asked who would explain the outcome of the surgery to Colleen.  Dr. Saunders said that he would explain it and that it was his job to do that.

As soon as Colleen could have visitors, Debra and Ruth went in to see her.  Colleen could see from their faces that they had been crying and asked what was wrong.  Debra said she should wait for the doctor and that everything was fine.  When Dr. Saunders arrived, Debra asked him how he would communicate with Colleen when she was "drugged," could not hear, and did not have her glasses, and he responded that he would have to write big enough for her to see.

Although Dr. Saunders does not usually discuss surgical results with patients immediately after surgery, he wanted to tell Colleen directly about the unexpected finding during surgery, the cholesteatoma, and that he had not been able to insert the new cochlear implant.  Colleen was groggy from anesthesia, had a bandage on her head, and did not have her glasses which she relied on heavily because of deficiencies caused by a disorder known as Turner Syndrome.  In addition, without a cochlear implant, Colleen was completely deaf.

Dr. Saunders communicated with Colleen verbally and by writing on a white pad of paper.  He also used the diagram of the inner ear that he had drawn while meeting with Ruth and Debra to show the location of the cholesteatoma.  Debra and Ruth were present during the first meeting between Colleen and Dr.

Saunders, although Ruth may not have stayed in the room for the entire meeting.  The first note that Dr. Saunders wrote on the pad was:

> Everything was OK with surgery except that I was not able to put the new implant in now.  You had a cholesteatoma and we will have to wait 4-6 months before we can put the new implant in.  This was the only safest thing to do.  Unfortunately we had to take the old one out -- so you will be without for a few months.

Debra also talked with Colleen during the meeting, and she felt that Dr. Saunders relied on her to some extent to communicate with Colleen.  The first meeting was brief, and Dr. Saunders left for another surgery.

Debra stated in her deposition that Dr. Saunders did not explain details about the cholesteatoma to Colleen, so Debra told Colleen the additional information that Dr. Saunders had given Debra and Ruth.  Colleen kept asking, "I'm going to die? I'm going to die?"  Her sisters reassured her that she was not going to die, but Colleen was focused on the word "die" rather than the other information about her surgery.

Several hours later, Dr. Saunders returned to see Colleen. Debra thought that the second page of Dr. Saunders's notes was from the second meeting and that she, Debra, wrote additional notes on the page.  In response to a question from Colleen, Dr. Saunders wrote:

> Not an infection, but a cholesteatoma.  This is what Dr. Kueton treated in this ear before.  I think you will do great and we will be able to put the implant in eventually but will have to wait a little longer than we planned and you will need another surgery.

Dr. Saunders then wrote, "I have to go back to surgery now, but I will see you in 1 week."

Colleen left the hospital later that evening and went to Debra's house in Concord.  Colleen's follow-up appointment was scheduled for September 22, 2011.  The day before, Debra called the office to have an ASL interpreter present during the appointment.  An interpreter was present for the September 22 appointment.  Colleen then had eleven appointments at DHMC between September 23, 2011, and November 8, 2013.  Dr. Saunders performed surgery on Colleen in April of 2012 for the new cochlear implant, which was activated in late May of 2012.

In scheduling an appointment for May 8, 2013, with Stella McHugh for mapping the cochlear implant, Colleen spoke with scheduler Tina Woods.  Woods asked Colleen if an interpreter would be needed for the appointment, and Colleen said no because her sister would be with her.  On the day of the appointment, however, a friend brought Colleen, and when she arrived Colleen asked for an interpreter.

McHugh asked the staff to see if an interpreter could attend, but no one was available.  As an alternative, McHugh decided to use a program called "Deaf Talk," a video relay conferencing system that provides ASL interpreting.  While the Deaf Talk system was being set up, McHugh had Colleen sign a statement that she agreed to proceed without an interpreter. Once Deaf Talk was operational, it was used during the appointment.

Discussion

The plaintiffs bring three claims under the ADA, one claim under the Rehabilitation Act, one claim under both the ADA and the Rehabilitation Act, and nine state law claims.  DHMC and Dr. Saunders move for summary judgment on all of the plaintiffs' claims.  The plaintiffs object to summary judgment.

A.  Count I - Discrimination in Violation of Title III of the ADA

Title III of the ADA prohibits discrimination against an individual "on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ."  42 U.S.C. 12182(a).  Hospitals are included as public accommodations under Title III.  42 U.S.C. § 12181(7)(F).  Remedies in actions brought by private parties under Title III, 42 U.S.C. § 12188(a) do not include an award of money damages and, instead, are aimed at individuals who are currently being subjected to discrimination.[4]  Goodwin v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir. 2006).

To prove a violation of Title III of the ADA, a plaintiff must show that she is disabled within the meaning of the ADA, that the defendant is a private entity that owns or operates a

_____

[4]All of the allegations in Count I pertain to past actions.
The plaintiffs state that the alleged violations of Title III
"were the proximate cause of damages to Colleen Collins . . . ."
As such, the plaintiffs do not state a viable claim in Count I.

place of public accommodation, and that the plaintiff was denied
accommodation because of her disability.  Arizona ex rel. Goddard
v. Harkins Amusement Enters., Inc., 603 F.3d 666, 670 (9th Cir.
2010).  In this case, there is no dispute that the defendants are
covered by Title III of the ADA or that Colleen is a qualified
individual with a hearing disability.

In the complaint, the plaintiffs listed actions, lettered a
through h, that they alleged violated Title III of the ADA,
including the failure to communicate effectively and failure to
provide auxiliary aids for communication.  The defendants
addressed those allegations in the motion for summary judgment.
The plaintiffs do not object to summary judgment as to the
defendants' actions other than a failure to provide effective
communication and auxiliary aids.  Therefore, the plaintiffs have
admitted the facts presented by the defendants for summary
judgment on the unchallenged actions, LR 56.1(b), and have waived
their objections to summary judgment as to those actions, see
Sands v. Ridefilm Corp., 212 F.3d 657, 663 (1st Cir. 2000);
Cappalli v. BJ's Wholesale Club, Inc., 904 F. Supp. 2d 184, 195
n.7 (D.R.I. 2012).  See also Higgins v. New Balance Athletic
Schoes, Inc., 194 F.3d 252, 260 (1st Cir. 1999); United States v.
Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Therefore, based on the
undisputed facts, the defendants are entitled to summary judgment
on the actions listed as a, b, e, and h in Count I.

The plaintiffs' claim in Count I is that DHMC and Dr.
Saunders violated the ADA by failing to communicate effectively

with Colleen and failing to provide needed auxiliary aids for
communication after the surgery on September 16, 2011.[5]
Discrimination under Title III includes a defendant's failure to
"take such steps as may be necessary to ensure that no
individual with a disability is . . . treated differently than
other individuals because of the absence of auxiliary aids and
services . . . ."  § 12182(b)(2)(iii).  Regulations promulgated
by the Department of Justice implementing Title III require
public accommodations to provide "appropriate auxiliary aids and
services where necessary to ensure effective communication with
individuals with disabilities."  28 C.F.R. § 36.303(c)(1).  "The
type of auxiliary aid or service necessary to ensure effective
communication will vary in accordance with the method of
communication used by the individual; the nature, length, and
complexity of the communication involved; and the context in
which the communication is taking place."  For that purpose,
places of public accommodation are directed "to consult with
individuals with disabilities whenever possible to determine what
type of auxiliary aid is needed to ensure effective
communication."  § 36.303(c)(1)(ii).

The plaintiffs argue that Dr. Saunders did not communicate
effectively with Colleen.  They contend that an ASL interpreter

---

[5]To the extent the plaintiffs may have intended to allege
that the defendants provided ineffective communication during the
May 8, 2013, appointment, they have not argued that issue in
response to the motion for summary judgment.  Therefore, it is
waived.

was required at the meetings after surgery to communicate Dr.
Saunders's message.  The record does not support the plaintiffs'
theory.

The ADA requires reasonable accommodations for persons with
disabilities, to provide them "an even playing field," but does
not require that disabled persons be treated preferentially or
necessarily be given the accommodation of their choice.
Goldblatt v. Geiger, 867 F. Supp. 2d 201, 210 (D.N.H. 2012)
(quoting Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 107 (2d
Cir. 2003)); Abbott v. Town of Salem, 2008 WL 163043, at *6
(D.N.H. Jan. 16, 2008).  Unless the need for accommodation is
obvious, the requirement for reasonable accommodation usually
does not arise unless an accommodation is requested.  Kiman v.
N.H. Dep't of Corrs., 451 F.3d 274, 283 (1st Cir. 2006).

As an otolaryngologist, Dr. Saunders is familiar with the
effects of deafness on his patients.  In addition, Dr. Saunders
has focused specifically on communication issues due to hearing
impairment with his own patients and in a sign language program
for hearing impaired persons he founded in Nicaragua in 2006.
Dr. Saunders also co-founded the Coalition for Global Hearing
Health and serves on a consortium within the World Health
Organization to advise on issues related to hearing loss.  By
training, experience, and interest, Dr. Saunders is aware of the
communication barriers experienced by those with hearing
impairment.

11

Dr. Saunders knew that when he met with Colleen after surgery she would be deaf, under the effects of anesthesia, and somewhat limited in seeing without glasses.  Dr. Saunders planned to use the pad of paper and to write in large print to accommodate Colleen's deafness and sight problems.  It is undisputed that Dr. Saunders did not know until his post-surgery meeting with Ruth and Debra that Colleen knew ASL.  Debra and Ruth did not ask Dr. Saunders to use an ASL interpreter to communicate with Colleen.[6]

The effects of anesthesia were not part of Colleen's disability.  The plaintiffs have not shown or even suggested that other post-operative patients would have been less groggy.  Although the plaintiffs fault Dr. Saunders for talking with Colleen while she was under the effects of anesthesia, they do not link that criticism to Colleen's deafness.  Therefore, the effects of anesthesia are not part of the ADA claim.

Colleen concedes that because of being groggy she would not necessarily have understood an ASL interpreter any better than Dr. Saunders's notes on the pad.  Therefore, the plaintiffs cannot show that the lack of an ASL interpreter caused Colleen to be excluded from communications with Dr. Saunders.  See, e.g., Martin v. Halifax Healthcare Sys., Inc., 2014 WL 1415647, at *4 (M.D. Fla. Apr. 11, 2014).

---

[6]Debra and Ruth communicated with Colleen before and after surgery through lip reading, writing, and a bit of sign language that Debra knows.

In addition, Dr. Saunders's notes were not the source of the
information that caused Colleen concern.  Dr. Saunders wrote that
everything was OK except that he was not able to do the new
implant and had to take out the old implant.  When Colleen asked
Dr. Saunders about an infection at the second meeting, he
reassured her that she did not have an infection and told her
that she previously had been treated successfully for a
cholesteatoma.  Dr. Saunders never wrote that Colleen might die
nor did his notes even imply a life-threatening situation.

The record suggests that Debra told Colleen about the
additional information Dr. Saunders gave Debra and Ruth during
their post surgery meeting.[7]  Dr. Saunders provided Debra and
Ruth more detail about the cholesteatoma, including a concern
about the serious potential for harm if the cholesteatoma were
not completely removed.  That information may have caused Colleen
to think that she had an infection and to worry that if the
cholesteatoma were not properly treated she could die.

The plaintiffs assert that the defendants violated the ADA
by failing to ask what language Colleen understood best and what
accommodations would work best at the time of the post-surgery
meeting.  The record establishes that Colleen had always

---

[7]At her deposition, Colleen attributed that information to
Dr. Saunders, but Dr. Saunders's notes on the pad of paper do not
include that information.  Debra testified at her deposition that
Dr. Saunders did not explain those details to Colleen and that
she, Debra, told Colleen the additional details.  Ruth stated at
her deposition that Colleen was concerned about the time she
would be completely deaf before the surgery for the new implant.

communicated with medical providers by lip reading and continued
to communicate with her sisters by lip reading and writing.[8]
Although Debra and Ruth informed Dr. Saunders and Stella McHugh
at the conclusion of their post-surgery meeting that Colleen knew
ASL, the plaintiffs have not shown that it would have been
possible to get an ASL interpreter for Dr. Saunders's meeting
with Colleen, which occurred just minutes later.

More importantly, Colleen testified at her deposition that
she would not have understood an ASL interpreter any better than
Dr. Saunders's notes because she was groggy from anesthesia.
Colleen also said that when she left the hospital she understood
the results of the surgery and that a second surgery would be
necessary in six months for the new cochlear implant.

Based on the undisputed facts, the plaintiffs have not shown
that Dr. Saunders's plan to accommodate Colleen's deafness during
the post-surgery meetings by large writing on a pad of paper was
unreasonable or ineffective.  They also have not shown even
disputed facts to show that the defendants violated the ADA by
failing to provide an ASL interpreter or any other auxiliary aid
during the post-surgery meetings.

––––––––––––––––––––

[8]Despite Debra's belief expressed in her deposition that Dr.
Saunders expected her to participate in communicating with
Colleen, there is no evidence that Dr. Saunders attempted to use
Debra or Ruth as interpreters during his meetings with Colleen.
Debra acknowledges that Dr. Saunders told Debra and Ruth that he
would explain the surgery results to Colleen.  Dr. Saunders said
in his affidavit that he did not ask Debra or Ruth to explain the
surgery results or to act as interpreters.

Therefore, the defendants are entitled to summary judgment on Count I.

B.   Count II - Rehabilitation Act

In Count II, the plaintiffs allege that by the actions listed in Count I the defendants also violated § 504 of the Rehabilitation Act.  Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 704(a).  When the plaintiff claims violation of section 504 due to a failure to accommodate a known disability, the plaintiff need not show intentional discrimination or discriminatory animus.  Ruskai v. Pistole, --- F.3d ---, 2014 WL 7272770, at *14-*15 (1st Cir. Dec. 23, 2014); Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008).

Generally, the ADA and the Rehabilitation Act are governed by the same standards.  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 39-40 (1st Cir. 2012); Enica, 544 F.3d at 338, n.11.  More specifically, the same standards apply to claims under Title III of the ADA and § 504 of the Rehabilitation Act.  Argenyi v. Creighton Univ., 703 F.3d 441, 445 (8th Cir. 2013); Kendall v. Shinseki, 2014 WL 6469433, at *3 (M.D. Fla. Nov. 16, 2014).  For the reasons explained above in Part A, addressing the plaintiffs'

15

claim under Title III of the ADA, the plaintiffs have not shown a triable issue as to the same claim under the Rehabilitation Act.

Therefore, the defendants are entitled to summary judgment on Count II.

C.  Counts III and IV - Title V of the ADA

In Count III, the plaintiffs assert that the defendants violated section 503(a) of Title V of the ADA by retaliating against Colleen for her efforts to end discrimination when they threatened to stop providing her treatment because she asserted her rights under the ADA.  In Count IV, the plaintiffs assert that the defendants violated section 503(b) of Title V by forcing her to sign a waiver of her rights under the ADA in retaliation for asserting her rights.  The defendants move for summary judgment on both claims.

Title V "prohibit[s] retaliation against any person, whether disabled or not, for opposing disability-based discrimination made unlawful by [the ADA]."  D.B. ex rel. Elizabeth B., 675 F.3d at 40.  "To make out a prima facie case of retaliation . . ., a plaintiff must show that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action."  Id. at 41.  "Once a

plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse action." Id.  If that burden is met, the plaintiff must show that the explanation is a pretext because the defendant was "motivated by a retaliatory animus." Id.

In support of the Title V claims, the plaintiffs say that there are two sides to the events of May 8, 2013.  They claim retaliation because there was no interpreter when Colleen arrived for her May 8 appointment.  They further assert that the alternative aid, DeafTalk, did not work.  They also assert that Colleen did not voluntarily write the note agreeing to treatment without an interpreter and instead felt coerced by Stella McHugh.

Colleen declined an interpreter for the May 8 appointment because she planned to have her sister with her.  She only asked for an interpreter when she arrived for the appointment.  Because an interpreter was not then available, Stella McHugh offered to use an alternative aid, Deaf Talk.  McHugh had Colleen write and sign a note that she agreed to proceed with the appointment without a live interpreter.  Colleen chose to proceed with DeafTalk to avoid the inconvenience of rescheduling.

The plaintiffs provide no evidence that a live interpreter was not provided at the May 8 appointment in retaliation against Colleen for previously asking for an interpreter.  Instead, the

17

evidence shows that Colleen declined an interpreter, which was offered for the appointment, and then changed her plans without notifying DHMC.  The plaintiffs have not shown that the note was required in retaliation for Colleen's request for a live interpreter, nor have they shown that Colleen was coerced into signing the note.

Therefore, the defendants are entitled to summary judgment on Counts III and IV.


D.  <u>Count V - Associational Discrimination in Violation of the ADA and the Rehabilitation Act</u>

In Count V, the plaintiffs alleged that the defendants discriminated against Debra and Ruth because of Colleen's disability in violation of the ADA and the Rehabilitation Act by forcing them to act as interpreters during the post-surgery meetings with Dr. Saunders.  The plaintiffs cited <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582 F.3d 268 (2d Cir. 2009), in the complaint to support the claim.[9]  In their objection to summary judgment, however, the plaintiffs provide no developed argument to support Count V.

---

[9]The circumstances in <u>Loeffler</u> are entirely different from the circumstances in this case.  Therefore, <u>Loeffler</u> does not support the plaintiffs' claim.

18

Persons who are not themselves disabled have standing to bring a claim under the ADA "only if she was personally discriminated against or denied some benefit because of her association with a disabled person." McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1142 (11th Cir. 2014) (citing 42 U.S.C. § 12182(b)(1)(E)). The Rehabilitation Act allows claims by non-disabled persons who suffer injury because they were subjected to conduct proscribed by the Act. McCullum, 768 F.3d at 1142 (citing 29 U.S.C. § 794a(a)(2)). To be actionable, the non-disabled persons themselves must "establish[] an injury causally related to, but separate and distinct from, a disabled person's injury under the statute." Loeffler, 582 F.3d at 280.

The record does not support the plaintiffs' theory that Debra and Ruth were forced to act as interpreters for Dr. Saunders. There is no evidence that Ruth explained anything to Colleen during the two post-surgery meetings. To the extent Debra participated in the discussion, she did so of her own volition, not because Dr. Saunders required her to do so.

Therefore, the defendants are entitled to summary judgment on Count V.

E.  <u>State Law Claims</u>

In their complaint, the plaintiffs allege claims for breach of contract, negligence, negligent supervision and training, intentional infliction of emotional distress, violation of RSA 151:21, violation of RSA 358-A, violation of RSA 354-A, "Respondeat Superior," and enhanced compensatory damages.  The defendants move for summary judgment, pointing out the legal and factual deficiencies of the claims.  In response, the plaintiffs say only that there are factual disputes related to the state law claims that must be determined by a jury.

The plaintiffs' response is insufficient to raise any triable issue as to the state law claims.  The defendants have shown that based on the undisputed facts, they are entitled to judgment as a matter of law on the state law claims, Counts VI through XIII.

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment (document no. 19) is granted.  Summary judgment is entered in favor of the defendants on all of the plaintiffs' claims.

20

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

January 21, 2015

cc:  Peter J. Bauer, Esq.
     Peter W. Mosseau, Esq.
     Kirk C. Simoneau, Esq.

21